## THE SALEM MILL DAM CORPORATION *versus* JOSEPH ROPES.

Where by an act creating a corporation for the purpose of erecting mill dams, it was provided that the capital stock should be divided into 5000 shares, not exceeding 100 dollars each, and that after 1000 shares should be subscribed for, a meeting of the proprietors might be called, at which any acts might be done " for the purpose of organizing the corporation, and arranging its affairs," it was *held*, that no legal assessment could be made for the general objects of the act of incorporation until all the shares should have been subscribed for; but that an assessment laid to defray preliminary expenses incurred in obtaining the act of incorporation and ascertaining the practicability and utility of the enterprise, would be valid.

*Held* also, that the subscribers were *personally* liable for such assessment, they having, after the passing of the act of incorporation, signed an agreement to pay all such legal assessments as should be made after the corporation should be organized according to the act.

THIS was an action of *assumpsit* upon the following agreement, subscribed by the defendant and others, in April, 1826, *viz.* " Whereas it is proposed to establish manufactures in Salem, and with a view to that object an act of incorporation has been obtained, entitled An Act to incorporate the Salem Mill Dam Corporation, — we, the subscribers, severally agree o take the number of shares of the capital stock in said corporation which are affixed to our respective names, and to pay all such legal assessments on each of said shares as shall be made by the future government of said corporation, after the same shall have been organized according to said act ; it being understood, that in case more than five thousand shares shall be subscribed for, the committee under whose direction this subscription is opened, shall reduce them to that number, in such a mode as they shall think equitable."

The act of incorporation referred to, (*St.* 1825, *c.* 148, passed on the 4th of March, 1826,) provides, in the 4th section, " that the capital stock of said corporation shall be divided into five thousand shares, not exceeding one hundred dollars each." The 6th section provides, " that the said corporation, or its officers duly authorized by its by-laws, may, from time to time, make assessments upon the shares subscribed for, until the whole amount of the said capital stock shall be paid in. And if the proprietor of any share shall refuse or neg-

lect to pay any assessment for the term of thirty days from the time appointed therefor, the share or shares of such proprietor may be sold by public auction. In the 7th section it is provided, that the persons named in the act, or any two of them, shall call the first meeting of the corporation, by giving notice in one or more of the Salem newspapers ; "and at said meeting there shall be chosen, by a majority of votes, a clerk or secretary, who shall be duly sworn to record the doings thereof ; and any act or acts may be done for the purpose of organizing the said corporation, and arranging its affairs ; at which meeting every person shall be entitled to one vote for each share owned by him. And the number, powers and duties of the several officers, agents and servants of said corporation, together with the time and manner of choosing and appointing them, and the number of votes to which the shares of each member of the corporation shall entitle him at future meetings, may be regulated by the by-laws. Provided, however, that no meeting as aforesaid shall be called before one thousand shares shall be subscribed for ; and provided also, that no proprietor shall be entitled to more than twenty votes."

In the 9th section it is enacted, that if at any time the corporation shall use the water power to be created by them, for the purpose of carrying on manufactures, the corporation shall be subject to the provisions of "an act defining the general powers and duties of manufacturing corporations," except that the liability of the members, in their individual capacity, for the debts of the corporation, is to terminate, unless such debts shall be put in suit against them within one year after they shall have ceased to be members.

At the trial, which was before *Putnam* J., it appeared that the defendant had subscribed for twenty shares. On the 17th of May, 1826, the first meeting of the stockholders was held, when the act of incorporation was accepted by a unanimous vote, and the corporation was organized according to the act. The report of the committee for obtaining subscriptions was laid before the meeting, stating that the number of shares subscribed for was at that time twenty-three hundred and seventy-eight, and recommending that subscriptions should not be received after the whole number of shares subscribed

for should amount to three thousand. Additional subscriptions were subsequently obtained, so that on the 4th of September, 1826, the whole number of shares subscribed for was twenty-six hundred and eighty-seven ; and this number was never afterwards augmented. On that day the first assessment, being three dollars on each share, and for the defendant's proportion of which this action was brought, was laid by the directors, pursuant to the by-laws, to be paid into the treasury of the corporation on or before the 13th of September. At a meeting of the directors on the 24th of October, it was voted to proceed in the erection of the dams, whenever available funds to the amount of 250,000 dollars should be obtained. One hundred and twenty-five of the shares subscribed for were then supposed to be insolvent and not available. The defendant was then a director, and a large sum of money had been expended by the board of directors, and many contracts had been made by them. The defendant was present at the first meeting of the stockholders, and likewise usually attended the subsequent meetings of the corporation.

The defendant moved for leave to prove that the sum for which subscriptions had been obtained, was insufficient to complete the work undertaken ; but the motion was overruled.

The books and records of the corporation and directors made a part of the case.

According as the opinion of the Court should be upon the foregoing statement, a default or nonsuit was to be entered, or a new trial granted.

*Pickering*, for the plaintiffs. The question is, what is the true construction of the contract upon which this action is founded. On its face, it is an unequivocal agreement to take a number of shares, and to pay all such legal assessments as shall be made thereon after the corporation shall be organized according to its charter ; and the corporation was so organized before this assessment was laid.

The object of the charter will afford some aid in construing the agreement. The parties had in view the creation of a water power by means of dams, and the prosecution of manufactures. These were to be successive operations, and it was

*Salem Mill Dam Corp. v. Ropes.*

*Nov 9th*

26

Salem Mill Dam Corp. *v.* Ropes.

supposed that a sufficient fund for the erection of the dams might be raised upon a part only of the 5000 shares into which the capital stock was to be divided. This is to be inferred from the proviso in the 7th section of the act of incorporation, that "no meeting shall be called before 1000 shares shall be subscribed for." It could not then be necessary, as the defendant will contend, that the whole 5000 shares should be taken up, in order to render an assessment valid.

This assessment might be necessary to defray various preliminary expenses in procuring the act of incorporation, making surveys, examining titles, &c. And the Court cannot say that it was not required for the incidental expenses of organizing the corporation.

The acts of the parties have given a construction to the contract. The corporation voted that the subscriptions should not be extended beyond 3000 shares. The defendant attended the meetings, was himself a director, and assisted in laying the assessment, and in making large contracts on behalf of the corporation. He has thus declared that he would pay his assessments notwithstanding all the shares were not taken, and he is estopped to make that objection. *Chester Glass Co.* v. *Dewey*, 16 Mass. R. 94.

The 4th section provides, that the capital stock shall be divided into 5000 shares, and the 7th, that no meeting shall be called before 1000 shall be subscribed for. Taken together, these provisions mean, that the number of shares shall not be more than 5000 nor less than 1000.

Neither in the charter, nor in the contract, is there any express condition that all the shares shall be subscribed for, and it is apprehended that none such is implied. Where a condition of this kind is intended, it is usually expressed, either in the act of incorporation or in the subscription paper. The limitation of the capital stock to 5000 shares does not sustain such an implication. That has no bearing upon the relative rights of the corporation and stockholders ; it is a matter between the corporation and the government, the design of it being to prevent an undue proportion of property being held in mortmain. 1 Kyd on Corp. 103, 104. The individual stockholder is protected by limiting the assessments to 100

dollars upon a share. An implied condition like the one in question, would present a great obstacle to carrying on an enterprise of this kind, as a single share not subscribed for would defeat the whole project. It cannot be supposed that the legislature intended to embarrass this corporation by such an implication.

*Saltonstall* and *Shillaber*, for the defendant. The act of incorporation makes part of the contract, and the defence proceeds upon the ground, that the plaintiffs have not so far complied with the requisitions of that act as to make the assessment "legal."

The provision, that the capital stock shall be divided into 5000 shares, is imperative. It is not an implied, but an express condition of the contract.

It has been suggested, that the statute itself makes the division, or that entering in the corporation book, shares numbered from 1 to 5000, is a compliance with the statute. We think, however, that the shares must be real, available stock, owned by individuals, and not existing merely in name. The object of the charter was to enable the plaintiffs to carry into effect a project of great magnitude, in which the public were interested as well as the corporation, and for which a large capital would be required. A dam was to be thrown across an important navigable river. The equivalent to the public for the privileges granted, was the provision in question, which was intended to secure a fund adequate to the full accomplishment of the undertaking.

In contracts of this nature between other corporations and individuals, similar provisions have been made respecting the number of shares. In *Worcester Turnpike Corp. v. Willard*, 5 Mass. R. 80, as the act of incorporation did not specify the number, it was stipulated in the contract itself that there should be 600 shares, and it was averred in the declaration, and proved at the trial, that 600 had been subscribed for. See also *New Bedford &c. Turnp. Corp. v. Adams*, 8 Mass. R. 138.

It was important to the defendant to be assured that he should not lose his money, by reason of a failure to complete the undertaking. The corporation had in view successive

operations, we admit, but it was likewise contemplated, that the whole sum of 500,000 dollars should be at their command to apply to one operation, in case it should be necessary. For if with only 1000 shares taken, they should engage in a work requiring more than 100,000 dollars, after 100 dollars has been assessed on each share the work must be suspended, perhaps with a sacrifice of all the money laid out upon it.

The defendant subscribed with an intent to be concerned in manufactures, according to the provision in the 9th section of the charter, it being supposed that the whole capital stock would be sufficient to create the water power and to establish a manufactory. But if the corporation could begin to act with only 1000 shares subscribed for, their whole fund would be exhausted by the erection of the dams, and so the defendant's object would be in part defeated ; unless they should engage in manufactures upon credit, and then his whole property might be taken for the debts of the corporation. This consequence might indeed happen, even if all the shares were taken up, but the risk would be comparatively small.

It has been objected, that if all the shares were subscribed for, the defendant's proportion of responsibility might be increased by the insolvency of some of the subscribers. The answer is, that in regard to this he would have all the security which was contemplated by the act of incorporation. The insolvent shares might be sold.

The provision that a meeting may be called when 1000 shares shall be subscribed for, instead of a privilege, is a restraining clause. But for this provision, the persons named in the charter might have held a meeting for the purpose of organizing the corporation and arranging its affairs, before any shares were taken. The other enactments in the same section show, that the terms " organizing the corporation and arranging its affairs," include only proceedings preliminary to the execution of the great objects of the charter.

The defendant has not by his own acts waived any rights or changed the nature of the contract. Here is an express contract made with him as a stranger to the corporation, and it must be proved as alleged. If he attended meetings of the cor-

pcration and voted, it was only as a corporator, and not with any reference to this contract ; which was a collateral undertaking. *Middlesex Turnp. Corp.* v. *Locke,* 8 Mass. R. 268 ; *The Same* v. *Swan,* 10 Mass. R. 384.

It is suggested, that this assessment may have been laid for the purpose of defraying incidental preliminary expenses. Had it been so, the defendant would not have obliged the corporation to resort to this action.

*Mason,* (of New Hampshire,) in reply, insisted that the assessment was legal.

The act of incorporation authorizes a meeting after 1000 shares are taken, for the purpose of organizing the corporation and arranging its affairs. It is not common to insert a clause of this nature in acts of incorporation, and if the design was to provide for the mere ceremony of organization, it should seem to be superfluous. A better reason however for this provision may be easily discovered. The act describes works of great extent and importance, which were proposed to be undertaken, and the object of this clause was, that reasonable evidence should be afforded of the ability of the corporation to proceed in them with a prospect of completing them. They were to be undertaken successively, and after the water power should be created, the corporation had the option to dispose of it to other persons, or to use it for carrying on manufactures. As soon therefore as the corporation was organized according to the act, it was in full operation. Arranging its affairs includes the appointment of agents with full power to transact all the business of the corporation.

The true question then is, whether the charter restrains the corporation from making assessments before the whole 5000 shares are subscribed for. The contract seems to contemplate that assessments will be laid immediately after the organization, and there is no express provision in the charter to prohibit it ; and it must be a necessary construction that shall lead the Court to imply that it cannot be done until all the shares are taken. The 1st section limits the capital of the corporation to 700,000 dollars, which is on the ground of public policy ; and the 4th prescribes that the stock shall be divided

3 *

into five thousand shares, not exceeding 100 dollars each, the object of which is to prevent more than 500,000 dollars being drawn from the stockholders by assessments. Without contravening these enactments, the corporation may vote at once that they will not assess more than 5 dollars on a share, and then what becomes of the supposed security to the public and to the defendant? It has been remarked, that the shares are entered in the corporation book and numbered from 1 to 5000. We insist that this is a division within the meaning of the act.[1] The act itself, in saying that the stock shall be thus divided, makes the division. The practice of other corporations is in conformity with this view of the subject. It is usual to have *reserved* shares. In the act incorporating the Boston and Roxbury Mill Corporation, the capital stock is divided into 3500 shares, and provision is made, that when 2000 shall be taken, the subscribers may organize the corporation and arrange its affairs, and if the funds raised upon 2000 shares shall be insufficient, the corporation is authorized to sell the shares not subscribed for. Here then is a legislative construction, that organizing a corporation and arranging its affairs, puts it into full operation.

The 6th section provides, that this corporation may " make assessments upon the *shares subscribed for*, until the whole amount of the said capital stock shall be paid in." What does this imply, but that some shares may not be subscribed for, and that the reserved shares may be disposed of at any time, as occasion shall require?

The contracts made by the corporation are binding on it. The plaintiffs cannot say to their creditors, that there was an occult condition which was not complied with, and that therefore they are not held ; and if they are held, the money necessary to fulfil the contracts can be raised only by assessments. So of the incidental expenses which must have been incurred in organizing the corporation.

At least, the defendant is estopped by his own conduct to contest the validity of the assessment. He has participated in all the acts done by the corporation, and has led it on to in-

---

[1] See Revised Stat. c. 38, § 9, 10

cur heavy expenses ; and shall he be permitted to throw the whole burden upon his associates who have paid their assessments ?

The case cited of *Middlesex Turnp. Corp.* v *Swan,* has no bearing on the one under consideration. It was there held, that a subscription for one road could not apply to a different road. It was a case of variance. The present is one of construction. The defendant could only expect that 5000 shares would be subscribed for, but with the knowledge that the subscription might fall short of that number.

The opinion of the Court was afterwards drawn up by

PARKER C. J. Upon the general question presented in the argument of this case, *viz.* the legality of an assessment for the general objects and purposes for which the plaintiffs were incorporated, the Court are unanimously of opinion that such assessment would not be valid.

We are brought to this opinion by a careful consideration of the act of incorporation, and by a just construction of the obligations incurred under the instrument by which the individual members associated and became corporators. We consider the special promise incorporated with the subscription, as making the persons and property liable, to the extent of the subscription ; that is, to pay all assessments which shall be legally made ; the object of this form of subscription being obviously to create a personal duty upon those who should subscribe, beyond the statute liability which can be enforced only against their shares. The principle has heretofore been settled in analogous cases, that a mere subscription creates no promise, and gives no security to the corporation beyond the value of the stock, but that a promise superadded gives a right of action, where there are parties in being to give and take the promise.[1] And this distinction is reasonable ; for as the objects for which such incorporations are applied for and granted are generally experimental, and as expenses must be incurred in trying the experiment, it is right and just that those who embark in the same cause should be holden to each other for a fair apportionment of the

---

[1] See *Bryant* v. *Gordnow* 5 Pick. (2d ed.) 230 and note 1.

expenses ; and it is not unjust, if a majority of those who
associate should determine to complete the object, that those
in whose promises they confide to bear their proportion of
expense should be compelled to pay.   But all such promises
are in their nature conditional, and depend upon the terms
on which they are made, with reference to the capacity,
duties and powers of the other party to the contract, the cor-
poration ; who cannot extend the effect of the promise be-
yond the original meaning and extent of it, any more than
the other party can limit it.

The power of corporations is derived only from the act,
grant, charter or patent by which they are created.   In this
Commonwealth the source and origin of such power is the
legislature, and corporations are to exercise no authority,
except what is given by express terms or by necessary im-
plication by that body.   No vote or act of a corporation can
enlarge its chartered authority, either as to the subjects on
which it is intended to operate, or the persons or property of
the corporators.[1]   If created with a fund limited by the act,
it cannot enlarge or diminish that fund, but by license from
the legislature, and if the capital stock is parcelled out into
a fixed number of shares, this number cannot be changed by
the corporation itself.   Vide 1 Dane's Abr. 457, c. 22, *art.*
1, and the numerous authorities cited by that author.   The
promise on which this action is brought must be construed
with reference to the charter of the company, it being found-
ed on that, and is to be governed by it.

What then are the terms and the legal effect of the con-
tract now under consideration ?   The words, after stating the
object of the subscription and referring to the act of incor-
poration, are —

" We the subscribers severally agree to take the number
of shares of the capital stock in said corporation, which are
affixed to our respective names, and to pay all such *legal
assessments* on each of said shares, as shall be made by the
future government of said corporation, after the same shall
have been organized according to said act ; it being under-

---

[1] See Angell & Ames on Corp  80, 81.

stood, that in case more than five thousand shares shall be subscribed for, the committee, under whose direction this subscription is opened, shall reduce them to that number, in such a mode as they shall think equitable."

An analysis of this contract will show the true and only fair construction of it. The promise is to pay all *legal assessments.* Upon what ? Upon the shares subscribed for. Shares of what ? Of the capital stock of the company created by the act of incorporation. What is this capital stock ? This must be answered by the act of incorporation, upon which the whole contract is founded ; and a reference to that shows manifestly, that the whole capital stock is composed of five thousand shares, which are liable to be assessed to the extent of one hundred dollars on each share. So that, *potentially,* the capital stock is five hundred thousand dollars, but the corporators have a right to limit it to any less sum, by the assessment upon the shares, according to the amount of capital wanted for the object.

But this power of limitation is a privilege attached to the shares, and we think most clearly cannot be taken away by a reduction of the number of shares, leaving to the subscriber the hazard of being liable upon his subscription and promise to an amount much beyond what the actual expense of the project might subject him to, if the original number of shares were liable to assessment. Suppose, instead of the contemplated sum of five hundred thousand dollars, in the process and execution of the project, one hundred thousand dollars should be found to be competent to the purpose. Then it would follow, that upon five thousand shares a tax of twenty dollars on each share would be sufficient ; whereas, if the shares were reduced to one thousand, an assessment to the whole extent of one hundred dollars on a share would still be necessary.

Now a person called upon to subscribe, would naturally make his own calculations of the probable cost of the undertaking. He would see that the utmost limit of taxation is one hundred dollars upon a share, and that probably not more than one half of that sum would be required. I say probably, because the very fact of proceeding in the execution of

the project with but little more than half the number of shares taken up, shows the opinion of the corporation, that half the contemplated capital would be sufficient. We think the sub-scriber cannot be deprived of this probable advantage, by the vote of the corporation reducing the number of shares, and that a tax founded on such reduction would be illegal.

Such we think is the spirit of the act of incorporation, the intent and meaning of the limitation of the number of shares to constitute the capital stock. It could have been introduced for no other purpose than to show the extent of liability. The accomplishment of this project *may* cost five hundred thousand dollars ; there shall be therefore five thousand shares liable to the extent of one hundred dollars each. It *may* cost much less ; the shares may be taxed much less, but cannot be carried beyond one hundred dollars. These are the terms held out to the subscribers by the act of incorpora-tion, and by the subscription paper itself ; for the promise is, to pay what shall be *legally* assessed *according to the act of incorporation.* Besides which, it is agreed, that if there be an over-subscription, the shares shall be reduced to the number prescribed in the act ; and there is no provision for the case that has happened, of not much more than one half of the number of shares being subscribed for.

There is another view of the subject which goes strongly to show the correctness of this exposition of the contract. Suppose the sum contemplated by the legislature as at least the possible cost of the undertaking, should turn out *to be all necessary* for its accomplishment ; so that the expenditure of one half of the sum, would, in all probability, without the means of increasing it, be the cause of the loss of every thing but the value of the materials : — would the corporation have the right, by thus reducing the number of shares, to put in jeopardy the property of the corporators ? Certainly not. Every subscriber has a right to calculate upon a fund com-puted to be commensurate with the object, and that each of five thousand shares should be liable, like his own, to a tax of one hundred dollars, in order to produce that effect. A power in the corporation to reduce the shares to one thou-sand, without the power of taxing them beyond one hundred

dollars, would be a power to expend one hundred thousand dollars and no more, upon a project, which, to be profitable or even useful, would require five times that amount. The money expended in such case, would be nearly all lost and wasted. Nor do we believe that the corporation can make such a reduction legal, by a vote to limit the assessment upon a share to a less sum than one hundred dollars; for the same result of insufficient funds, and a consequent loss, might be produced.

If the subscription paper or contract had been in a form of words a little different, a question could hardly arise as to its construction. Suppose it had been, — Whereas it is proposed to raise a sum, not exceeding five hundred thousand dollars, for the purpose of erecting dams, &c. in the town of Salem, and the capital stock is divided into five thousand shares, now we, the subscribers, agree to take the number of shares set against our names and pay such sums as shall be assessed upon our shares. What does this import, but that the subscriber to a share agrees to take and pay for one *five thousandth* part of the capital stock to be raised? Could he, in that case, by virtue of such contract, be held to pay a *thousandth* part? Certainly not. Now the subscription paper in this case is precisely of the same character, and of the same legal import and effect. That subscription and promise refer to the act of incorporation. That act requires that the capital stock shall be divided into five thousand shares; and the paper itself recognises that number as expressive of the amount of stock.

It has been urged however in argument, that an examination of other parts of the act of incorporation will show that it was the intention of the legislature, that the company, when organized, might proceed to execute the full purposes of their incorporation by assessments upon any number of shares over one thousand.

We construe the 7th section of the statute very differently, and think it shows most manifestly, that the legislature had in view an organization for special and limited purposes, previously to the completion of the stock by a full subscription. What is this provision of the 7th section? Any two

36

of the persons named in the act of incorporation are author-ized by it to call a meeting immediately after the passing of the act, at which meeting a clerk or secretary may be chosen, who shall be duly sworn to record the doings of the meeting ; and any acts may be done for the purpose of organizing the said corporation and *arranging its affairs :* Provided no meet-ing shall be called as aforesaid, before one thousand shares shall be subscribed for.

It is clear that it was not intended by this section to grant a power not contained in the other sections of the act, ex-cept so far as to authorize the calling of the first meeting for the necessary purpose mentioned in the section. It was to be a meeting of organization and preparation. Not even the officers, except the clerk or secretary, were to be chos-en ; but they were to arrange their affairs, that is, take all the preliminary steps necessary to the advancement of the under-taking, — provide by-laws, agree upon the number of votes, and prescribe the powers, duties and number of the general officers and agents necessary to be employed, together with *the time and manner of choosing and appointing them.* Clearly this was intended by the legislature, to grant the pow-er of acting only to a limited extent, for the mere purpose of taking such precautionary and preliminary steps as would be absolutely necessary to the success of the undertaking, and even to the procurement of a full subscription. At this meeting " *any act or acts may be done for the purpose of organizing the said corporation, and arranging its affairs ; at which meeting every person shall be entitled to one vote for each share owned by him.*" Why limit the powers of this meeting to these specified objects, if, as contend-ed, the corporation had full power of raising the whole cap-ital upon any number of shares not below one thousand ? And this too, under the phrase *arranging its affairs,* which obviously means something short of carrying into execution the project in full, and assessing those who may have sub-scribed, to the extent of the liability of the shares. The corporation, under this section, had the same power of tax-ing upon one thousand and one shares, as they would have upon twenty-six hundred ; and can it be supposed, that un-

der the general terms of this act, and under the subscription, they can have the right to reduce the taxable capital down to one fifth of that on which the subscription was founded ? Upon what principle can a tax on two thousand and six hundred shares be sustained, that would not equally justify one upon any less number not below one thousand ? But it is said they became a corporate body by the acceptance of the act, and being such they enjoy all the powers vested in the body, and, of course, the power of proceeding in the objects of the incorporation, and then of necessity follows the power to assess all necessary taxes. But all this is *petitio principii.* The whole question is, whether they were a body politic and corporate with full powers, before the capital stock was created, and whether the legislature was not careful to give only limited powers until that event should happen. For no other reason is it possible to conceive why the specification of power under the 7th section should have been enacted. And it certainly cannot be within the authority of a company, by a vote, to assume a power beyond the provisions of their charter.

This question goes deep into the interests of those who embark in projects of improvement with the right to calculate upon a certain capital, and on their own liability to contribute towards raising it. If with the expectation of five hundred associates, or shares in that proportion, those who represent two hundred can assemble, and agree to carry on the whole work, by a major vote of that number, and assess themselves and the rest, and these doings are binding on the minority, the effect will be to discourage such enterprises, and subscriptions to objects which from their nature must be of doubtful success, will cease. A man may be willing, from public motives alone, to take his chance upon a limited proportion of five thousand shares of a capital stock, and altogether unwilling to adventure upon half that number ; and if he secure himself by the terms of his subscription, he cannot be bound beyond it by a major vote of those who may choose to persist in the adventure under discouraging circumstances.

But it has been argued, that, by the 6th section of the act of incorporation, the power of making assessments upon less

than the whole number of shares contemplated as the amount of the capital, is given by express provision or. necessary implication. We think a contrary inference more natural and just.

This section provides, that the corporation, or its officers duly authorized by its by-laws, may from time to time make assessments *upon the shares subscribed for.* If this had been all, the argument would have been plausible, but only plausible ; for the whole statute would be taken together, in the construction, and then by the shares subscribed for, would be found to be intended the five thousand shares which were to constitute the capital stock. But the assessments are to be made upon *the shares subscribed for, until the whole amount of the said capital stock shall be paid in.* Now the capital stock here contemplated was five hundred thousand dollars, because the power was given to assess to the whole extent of one hundred dollars a share on all the shares. The object of this section, to wit, an assessment upon the shares subscribed for until the capital stock should be paid in, could never be attained by assessments upon less than the whole number of shares ; and therefore the legislature did not intend by this phraseology to defeat this general object before explicitly stated. There is nothing then in the statute, which has a tendency to vary the obvious and necessary construction of the 4th section, which requires that the capital stock shall be divided into five thousand shares. This is to govern and limit the contract upon which the suit is brought, for the contract is referred to and founded upon this provision. And to extend it further would be to substitute a contract of our own making, for that on which the parties agreed.

And we perceive not the hardships which have been said to be likely to follow this decision. The act of incorporation remains in full force. If the proposed undertaking is likely to prove useful and profitable, it will be no difficult matter to procure subscribers enough, in addition to those already bound, to authorize the company to proceed. In that case. the present subscribers cannot recede, and we think them bound by their promise, as well as upon their shares, to submit to and pay all the assessments which may then be

made within the terms of the act. It probably was never be- <span style="float:right">Salem Mill<br>Dam Corp.<br>v.<br>Ropes.</span>
fore attempted to proceed to the final execution of a public
or private project compulsorily, upon one half of the contem-
plated shares set forth to the subscribers as representing the
amount of stock. In the act establishing the Boston and
Roxbury Mill Dam company, the possibility of a failure of
the subscription was anticipated and guarded against, by enact-
ing in the 9th section, that the corporation, or its officers, may
make assessments on the shares subscribed for, for the pur-
pose of effecting the objects of the corporation, and for any
other necessary purpose ; provided that the whole amount of
the assessments shall not exceed one hundred dollars on each
share, and in case the amount of one hundred dollars so as-
sessed upon each share will not supply the necessary funds,
the corporation may raise the funds required by *selling any
shares not subscribed for,* or by creating and selling any num-
ber of shares over and above the number prescribed in the
act. The subscribers under this act of incorporation were
aware that their shares might be assessed, although the sub-
scription might not be full, and probably considered it imma-
terial, as nothing but their shares would be liable ; and *even
if they should make special promises to pay the assessments,
they would do it with a full knowledge of the consequen-
ces.* Not so in the case before us, for from the tenor of
the subscription paper, and the act of incorporation to which
it referred, they would have no means of conjecturing, that
by a vote of the corporation reducing the number of shares,
they might be held personally to pay a much larger sum than
otherwise would be chargeable upon their shares.

Hitherto we have considered only the general question,
whether the corporation can proceed to make assessments for
the general objects and purposes of the charter, upon the sub-
scription as it now stands, or upon any number of shares less
than the whole number into which the capital stock is divided **40**
by the act.[1] It is a distinct question, whether the action can
be maintained for the specific tax for which it is brought.

---

[1] See *Salem Mill Dam Corp.* v. *Ropes,* 9 Pick. 195; *Central Turnp. Corp.*
v *Valentine,* 10 Pick. 145, 146.

It is agreed in the statement of facts, that previously to the assessment of this tax, " a large sum of money had been expended by the board of directors, and many contracts had been made by them." The amount of the money disbursed, and the nature and extent of the contracts, are not specified ; but it appears by a certificate of the treasurer, which has been handed to us since the argument of the cause, that the disbursements made, together with what is due for necessary expenses, amount to 11,412 dollars and 23 cents ; and that contracts have been made for land, wharves, flats, &c. to the amount of 10,512 dollars and 50 cents : besides which there are other pending contracts, relating to timber and materials, the nature and amount of which are not stated. In regard to these contracts, we do not think they afford a basis for the assessment, because they relate to the end and the object of the corporation ; and whether authorized or not, so as to make the corporate property liable for damages for the breach, or the directors by whom the contracts were made, or such members of the corporation as may have expressly assented to the making of the contracts, we are clear that the corporators are not personally liable upon their promise, because an assessment for this purpose is not a legal assessment within the terms of the promise and within the provisions of the act.

If the corporate powers to the extent of assessing upon the stockholders for the whole expense of the undertaking, did not exist until the whole number of shares had been taken up, which we think has been shown, it follows, necessarily, that there was no power in the corporation to authorize contracts made for the purpose of completing the undertaking ; and then it would also follow, that the act of the directors in making such contracts was without legal authority. If it be granted that a contract justifying an assessment, could be made for the purchase of lands, wharves, &c. to the value of ten thousand dollars, it would not be possible to deny to the directors, the same power to make one or more contracts for the completion of the whole object, should it require the utmost limit of taxation upon the shares. This, it is said, will

be hard upon those who have contracted with the directors or their agent, upon the faith and confidence that their acts would bind the corporation and the individual corporators by the terms of their subscription. But if hard, it is not new, that persons have made contracts with supposed agents, expecting the principals would be bound, and have been obliged to rely for their remedy upon the personal liability of those who assumed to be agents.[1] But it will be hard upon the directors to be made personally liable on contracts which they supposed they were making for the corporation. This is true ; but the hardship cannot affect the legal principles by which the case must be governed. If property was the subject of their contracts, and the directors should be obliged to pay for it, the property will be theirs ; if damages only for the non-performance of the contracts should be recovered, it may be supposed that the terms of the bargain were so equal as to produce no great distress ; and if any of the corporators stimulated the directors to the exercise of this authority, by acts or votes, it may be that such persons will be held, in a proper action, to contribute to make up the loss. But those corporators who dissented, not being bound by the tenor of their original contract, cannot be held to contribute towards expenditures which were not warranted by the state of the corporation when they were incurred. From the precaution used in regard to the contracts actually made, of making them depend on the prosecution of the enterprise, it is not probable any difficulty will arise from this source.

But in regard to the disbursements actually made in money, or for which contracts are subsisting, in relation to expenses of a preliminary nature, necessarily incurred to obtain knowledge on the subject of the undertaking, or for the purpose of forwarding the subscription, and extending the public patronage, we have come to a different conclusion ; in which we think we are equally well warranted by the act of incorporation and by the terms of subscription. We suppose all the prelimina-

---

[1] See *Hastings* v. *Lovering*, 2 Pick. 221 ; *New England Mar. Ins. Co.* v *De Wolf*, 8 Pick. 5€· 2 Kent's Comm. (3d ed.) 631, 632.

           

ry expenses, such as for necessary surveys, legal advice in relation to titles to land which it might be necessary to acquire, employment of many persons, expense of meetings, and a variety of charges incident to the commencement of so considerable an object, are in the nature of charges either upon the original promoters of the design, or upon the corporation when organized ; upon the latter, if they expressly or by implication assume the same. And we take it for granted that these expenses have been assumed, and that they constitute the amount stated as actual disbursements by the directors, or that similar expenses have since been incurred by the corporation itself, which constitute these disbursements. On this subject however we are not sufficiently informed, as the items which compose the gross sum charged as disbursements, are not stated. If we found our opinion upon a false basis in this respect, and the parties think it worth their while to contend further, a new trial can be ordered to settle this point

Supposing then that the sums expended are for objects such as above mentioned, or similar to them, that is, for purposes preliminary to the actual execution of the project, we think a tax not too large to cover such expenditure is valid, and that the defendant is bound upon his promise to pay it.

And we found our opinion upon a deliberate consideration of the act of incorporation, and particularly the 7th section of that act.

The legislature and the petitioners for the act, were probably aware, that the nature of the project which was wished to be authorized, was such as to require considerable expense, in order to produce that degree of information which would be necessary to insure a sufficient subscription. The scheme was new, except that it was preceded by the Boston and Roxbury Mill Dam Corporation, which, notwithstanding the most sanguine expectations, was known to have failed in regard to any profit to be derived by the owners of stock. The employment of much skill and judgment was requisite to enable them to show the practicability of the scheme, and its utility or probable profit. Provision therefore was made in the act of incorporation, for the organization of the com-

pany upon one fifth part of the number of the shares consti-
tuting the capital stock, and power was given to the corpora-
tion so organized, to " arrange its affairs." We have before
shown that the power given under this phraseology was ne-
cessarily a limited power. We are equally clear, that more
was intended than a mere organization, for this power of ar-
ranging its affairs is superadded to the power previously giv-
en, to organize the company. Within the reasonable con-
struction of this phrase, " arrange its affairs," (presuming,
as we are bound to presume, that something was intended,)
we think was given the power to look into the circumstan-
ces and affairs of the project, the expense to be incurred to
bring it into its existing state, the measures necessary to at-
tract the public approbation and patronage, delineations, plans,
surveys, philosophical examinations of the surface and con-
tents of bays, coves, &c. to be occupied, expense of meet-
ings, procuring subscriptions, &c. all of which might be ne-
cessary to enable the projectors to give such an exhibit of
probable results as would be likely to promote the subscrip-
tion.

Having this power in regard to these preliminary arrange-
ments, and being a corporation, we think the power to assess
for the purpose of defraying the consequent expense, neces-
sarily follows ; for without any express authority, corporations
may raise money by assessments for the legitimate purposes of
their institution.

And power to this extent must be presumed to have been
recognised by each subscriber, for he refers to the act, and is
bound by a fair construction of it, whether he was aware of
it at the time or not.

Had the corporation, immediately upon its organization,
with one thousand shares only subscribed, voted to raise ten
thousand dollars for the purpose of enabling the directors to
procure all necessary information, and to take all proper
measures to procure a full subscription to the projected
measure, and to pay all expenses which had been incurred
in obtaining the act of incorporation and otherwise in pro-
moting the object, we cannot doubt but an assessment found-

ed on such vote would have been legal and valid, and would be justified under the power given to " arrange its affairs." Such purposes would be mere arrangements, and the power being granted to make them, draws after it the power of providing by assessments for the expenses certainly and necessarily incident and consequent.

Suppose after such measures had been taken, and an expense unavoidably incurred, the result of the investigation had been so unfavorable as to induce the majority of the actual corporators, or of shares, according to the mode of voting, to discontinue any further proceedings, and abandon the project ; — how shall these expenses be defrayed ? Certainly by a tax, for the expenses were incurred for the corporation, and with full power to incur them by virtue of the 7th section of the act. It is true, a tax might be unavailing amidst such circumstances, if there were no obligation collateral to that which by law rests upon the shares ; but where there is a personal engagement, there is no difficulty. Every subscriber, in such case, is made to pay what he promised, and no more. The assessment only apportions upon each subscriber his quota of the whole expense, according to his interest in the undertaking.

No vote has been produced showing the purpose for which this assessment was granted, and we do not think it necessary; for if the whole product of the assessment does not exceed the sum wanted for the expenses which may lawfully be provided for in this way, it may be presumed that this was the object of the assessment, and that the money so raised will be applied to these purposes.

The result of the whole is, that the defendant is personally bound by his promise to pay all such assessments as should be legally made ; that an assessment made to raise money to defray expenses necessarily incurred in arrangements preparatory to the execution of the objects of the incorporation, is legal ; that expenses of that nature having been incurred, and the assessment which is the subject of this suit not exceeding the sum necessary for the payment and discharge of them, the defendant is answerable for his proportion, according to the

number of shares he subscribed for, and must therefore be defaulted.* [1]

Salem Mill
Dam Corp.
*v.*
Ropes.

---

\* The following case was determined upon the like principles.

A verdict was found for the plaintiffs.

*Saltonstall* and *Shillaber*, for the defendant.

[1] See Angell & Ames on Corp. 306 to 308

